IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| KEVIN GEDDINGS, | ) | Case No.: _____ |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | |
| - against - | ) | **DECLARATION AND** |
| | ) | **MEMORANDUM OF LAW** |
| | ) | **IN SUPPORT OF PETITION** |
| JAMES M. JOHNSTON, JR., Chief | ) | **PURSUANT TO 28 U.S.C. § 2241** |
| United States Probation Officer, Eastern | ) | |
| District of North Carolina, | ) | |
| | ) | |
| Respondent. | ) | |

**JONATHAN I. EDELSTEIN**, an attorney admitted to the bar of the State of New York and those of the United States District Courts for the Eastern, Northern, Southern and Western Districts of New York, and **EUGENE H. MATTHEWS**, an attorney admitted to the bar of this Court, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 2241 that the following is true and correct to the extent of their knowledge:

**PROCEDURAL HISTORY OF THIS CASE**

On May 18, 2006, petitioner KEVIN GEDDINGS was indicted in the Eastern District of North Carolina on seven charges of honest services mail fraud (18 U.S.C. §§ 1341, 1346) and two charges of honest services wire fraud (18 U.S.C. §§ 1343, 1346). See Indictment in United States v. Geddings, PACER Document 1, Docket No. 5:06-CR-00136-D3 (E.D.N.C.).[1] Counts One through Five related to petitioner's appointment as a commissioner, his signature of an oath

---

[1] Because of this Court's familiarity with the facts of the case, petitioner presents them here in summary form to the extent necessary to adjudicate the petition. Should this Court require a more detailed factual statement, petitioner will provide one.

1

of office, and certain disclosures that he made to the North Carolina Board of Ethics after being appointed. Counts Six and Seven related to two communications prior to petitioner's appointment in which he sought a position on the commission. Counts Eight and Nine related to two e-mails that petitioner sent to his fellow commissioners containing articles that were supportive and/or critical of certain lottery vendors. Petitioner entered a plea of not guilty to the indictment and proceeded to trial.

At trial, the Government presented evidence that, between 2000 and 2002, petitioner received at least $131,545 from lottery vendor Scientific Games for consulting services relating to the South Carolina Lottery. In May 2004, after petitioner moved to North Carolina, he received a further $7500 from Scientific Games for video production.

In April 2005, as the state lottery became a live political issue in North Carolina, petitioner sent an exploratory email to the Governor's office asking whether, if a lottery were enacted, he might be considered for a position on the lottery commission. By return e-mail, the Governor's office informed him that he was not under consideration.

Thereafter, in May 2005, petitioner billed Scientific Games $5000 for preparing State Sen. Tony Rand for a televised debate. Additionally, during June, July and August 2005, Scientific Games provided petitioner with a $5000 monthly consulting fee plus a one-time payment of $4500 for production of radio advertising.

The last bill that petitioner sent to Scientific Games was presented on September 1, 2005.

On September 21, 2005, after one of then-House Speaker Jim Black's proposed lottery commission appointees became unable to serve, Scientific Games vice-president Alan Middleton and staffer Meredith Norris proposed that petitioner fill the vacant position. Petitioner was not present at the dinner where this proposal was made. Speaker Black agreed, and the following

2

morning, petitioner's appointment was made public. On September 23, then-Governor Easley sent a formal appointment letter to petitioner and requested that he sign and return an oath of office.

Petitioner served on the personnel subcommittee of the lottery commission and, at the first meeting, recused himself from final vendor selection votes.

Pursuant to Executive Order 1 of the State of North Carolina, petitioner was asked to fill out a "Long Form Statement of Economic Interest" on which Question 16 directed him to disclose any potential conflicts of interest. Petitioner filled out two such forms. In the first form, he did not give any response to Question 16. In the second form, completed four days later at the request of then-Chairman of the Board of Ethics Perry Newson, petitioner stated that he had interacted with "executives of both lottery companies" during his tenure as Chief of Staff to the Governor of South Carolina, but did not disclose his consulting relationship with Scientific Games or the payments he had received.

On November 1, 2005, Scientific Games made public the fact that it had paid petitioner $24,500 in consulting and production fees during 2005. Thereafter, petitioner resigned from the commission.

The Government presented several items of evidence which, in its opinion, showed that petitioner maintained a continuing relationship with Scientific Games even after being appointed to the lottery commission. It pointed to an email that petitioner sent to his assistant stating "pls do not disclose over the phone that Scientific Games is a client." Additionally, the Government presented evidence that petitioner had frequent conversations with Mr. Middleton during his tenure on the commission, during which he discussed lottery information. The Government further showed that petitioner emailed certain newspaper articles to his fellow commissioners


3

which, it was alleged, cast Scientific Games' chief competitor (Gtech Holdings) in a bad light.

Regardless of the significance of this evidence, however, it was undisputed that petitioner <u>did not</u> receive any bribes from Scientific Games and that there was no *quid pro quo* under which he received payment for corruptly performing his official duties. While petitioner received a check from Scientific Games for $9500 on October 7, 2005, it was beyond dispute that this represented payment of the September 1, 2005 invoice for services rendered during August 2005.[2] The invoice itself was put in evidence by the Government at trial. Moreover, the Government also put in evidence an internal email from Mr. Middleton stating that petitioner had been terminated as a vendor but that those invoices still "in the pipeline" would be paid.

It is further undisputed that petitioner did not send any invoices to Scientific Games after September 1, 2005, and that he neither sought nor received financial compensation for any services post-dating his appointment to the lottery commission. The $9500 check may thus have been, as the Government argued, part of the conflict of interest that petitioner concealed, but it was not and is not alleged to have been a bribe.

At the close of evidence, the Government voluntarily dismissed Count Eight, and the district court dismissed Counts Six and Seven pursuant to Fed. R. Crim. Pro. 29 on the ground that petitioner had no duty to provide honest services prior to becoming a public official.

During the Government's summation, the prosecution again made clear that the gravamen of the scheme was nondisclosure of material information, repeatedly urging the jury that nothing more was required to convict defendant. (T.2454-55, 2470, 2501-02, 2519-20, 2589, 2595). This argument culminated in the following statement by AUSA Bruce:

> When Kevin Geddings took official acts during the 40 days that he

---

[2] In particular, the $9500 represented petitioner's $5000 consulting fee for the month of August 2005 plus $4500 for pro-lottery radio advertising during the same month.

4

> was a member of the lottery commission, under the cloud of this tremendous conflict of interest, this actual conflict of interest as testified to by Beth Carpenter and Perry Newson, when he took any action under that cloud, it doesn't matter whether it ended up helping Scientific Games or not, he was breaking the law. He was violating his duty of honest services by taking those official acts while under this conflict of interest. And that's the scheme alleged, and that's the scheme we proved.

(T.2596) (emphasis added).[3]

In addition, this Court instructed the jury, *inter alia*, as follows:

> A public official has an affirmative duty to disclose material information to the public employer. When an official fails to disclose a personal interest in a matter over which she has decision-making power, the public is deprived of its right either to disinterested decision-making itself or full disclosure as to the official's motivation behind an official act.

(T.2708, 2744).

Subsequently, Counts One to Five and Nine were submitted to the jury. After deliberation, the jury acquitted petitioner of Count Nine but convicted him of Counts One through Five.

Petitioner proceeded to sentencing and, on May 7, 2007, this Court sentenced him to 48 months' imprisonment, a $25,000 fine and a $5000 special assessment. It should be noted that, during the sentencing colloquy, this Court stated that "this case does not fit the classic bribery paradigm." (S.22).

Judgment was entered against petitioner on May 7, 2007. See Judgment, PACER

---

[3] The prosecutors in petitioners' case recently reiterated this theme in a law journal article. See George E.B. Holding, Dennis Duffy & John Stuart Bruce, Federal Prosecution of State and Local Officials Using Honest Services Mail Fraud: Where's the Line?, 32 Campbell L. Rev. 191 (2009). The authors stated *inter alia* that "[w]hen a government official violates a conflict of interest disclosure requirement, no proof of quid pro quo is required… This is precisely the theory under which the government prosecuted Geddings." Id. at 223-24.

5

Document 106.[4] Petitioner paid the fine and special assessment levied against him, and on June 14, 2007, a satisfaction of judgment was filed with the Clerk of the Court. See Satisfaction of Judgment, PACER Document 114.

Petitioner appealed his conviction to the United States Court of Appeals for the Fourth Circuit, arguing *inter alia* that concealment of material information was not in itself sufficient to make out the offense of honest services mail fraud. On May 19, 2008, the Fourth Circuit affirmed the conviction. See United States v. Geddings, 278 Fed. Appx. 281 (4th Cir. 2008). After discussing the facts of the case, the court stated *inter alia* as follows:

> The federal mail fraud statute prohibits using the mails 5 for the purpose of executing "any scheme or artifice to defraud." Congress defined "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." Here, Geddings executed such a scheme by concealing his conflict of interest with Scientific Games and acting for its benefit as a lottery commissioner.

Id. at 286.

Petitioner sought certiorari to the United States Supreme Court, which was denied on October 14, 2008. See Geddings v. United States, 129 S. Ct. 435 (2008).

On August 25, 2008, petitioner moved to vacate his conviction pursuant to 28 U.S.C. § 2255, arguing that his trial counsel was ineffective in various respects. See Section 2255 Motion, PACER Document 127. This Court denied that motion on May 15, 2009. See Order on Section 2255 Motion, PACER Document 140.

On June 29, 2010, this Court ordered petitioner released from prison pursuant to the Supreme Court's decision in Skilling v. United States, No. 08-1394, 2010 WL 2518587 (June 24, 2010), discussed *infra*. See Order on Motion for Miscellaneous Relief, PACER Document 148,

---

[4] All PACER document references are to the underlying criminal action.

at 3-4. The order directed petitioner to report to the United States Probation Office for the Eastern District of North Carolina and specified that "Geddings will be supervised by the U.S. Probation Office in the Eastern District of North Carolina pending final disposition of his petition under 28 U.S.C. § 2241. <u>Id.</u> at 4.

Petitioner was released from prison on June 30, 2010 and has reported as directed to the Federal probation authorities in the Eastern District of North Carolina.

## **THE SKILLING DECISION**

The <u>Skilling</u> decision arose from the well-publicized collapse of Enron Corporation. Subsequent to Enron's 2001 bankruptcy, "an investigation uncovered an elaborate conspiracy to prop up Enron's stock prices by overstating the company's financial well-being." <u>Skilling</u>, 2010 WL 251857, *9. Jeffrey Skilling, Enron's CEO from February to August 2001, was among those indicted in connection with this scheme. <u>Id.</u> Skilling was charged with, *inter alia*, "depriv[ing] Enron and its shareholders of the intangible right of his honest services." <u>Id.</u>

On appeal, Skilling challenged his honest-services fraud conviction on the basis that the offense could not be made out without proof of a bribe or kickback and that the crime of honest services fraud was unconstitutionally vague. The Fifth Circuit rejected this argument, finding that the jury was entitled to convict Skilling "on these elements… (1) a material breach of a fiduciary duty ... (2) that results in a detriment to the employer," including one occasioned by an employee's decision to "withhold material information, i.e., information that he had reason to believe would lead a reasonable employer to change its conduct." <u>United States v. Skilling</u>, 554 F.3d 529, 547 (5th Cir. 2009). The Supreme Court granted certiorari. <u>Skilling v. United States</u>, 130 S. Ct. 393 (2009).

On June 24, 2010, the Court decided Skilling's case. After disposing of Skilling's claims

7

regarding prejudicial pretrial publicity, the Court proceeded to construe the honest services fraud statute to include only schemes involving bribery and/or kickbacks. See Skilling, 2010 WL 2518587, *27-28.

The Court began its analysis by tracing the history of the "intangible rights" theory of fraud from its genesis in Shushan v. United States, 117 F.2d 110 (5th Cir. 1941), stating as follows:

> The Fifth Circuit's opinion in Shushan stimulated the development of an "honest-services" doctrine. Unlike fraud in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, the honest-services theory targeted corruption that lacked similar symmetry. While the offender profited, the betrayed party suffered no deprivation of money or property; instead, a third party, who had not been deceived, provided the enrichment. For example, if a city mayor (the offender) accepted a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm's length, the city (the betrayed party) would suffer no tangible loss. Even if the scheme occasioned a money or property gain for the betrayed party, courts reasoned, actionable harm lay in the denial of that party's right to the offender's "honest services."

Skilling, 2010 WL 2518587, *24 (citations omitted). "Most often these cases involved bribery of public officials, but courts also recognized private-sector honest-services fraud." Id.

The developing honest-services fraud doctrine was brought to a halt by McNally v. United States, 483 U.S. 350, 360 (1987), which held that the mail and wire fraud statutes were "limited in scope to the protection of property rights." Thereafter, Congress enacted 18 U.S.C. § 1346, which stated that, for purposes of those statutes, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

Against this background, the Skilling Court considered Skilling's vagueness challenge. The Court noted that "[i]n urging invalidation of § 1346, Skilling swims against our case law's

8

Case 5:10-cv-00270-BO   Document 1-1   Filed 07/01/10   Page 8 of 14

current, which requires us, if we can, to construe, not condemn, Congress' enactments." Skilling, 2010 WL 2518587, *25. "[A]gree[ing] that § 1346 should be construed rather than invalidated," the Court "look[ed] to the doctrine developed in pre-McNally cases in an endeavor to ascertain the meaning of the phrase 'the intangible right of honest services,'" and then "pare[d] that body of precedent down to its core" in order to "preserve what Congress certainly intended the statute to cover." Id., *26.

The Court noted "that Congress, by enacting § 1346, meant to reinstate the body of pre-McNally honest-services law." Id. While conceding that the pre-McNally cases were "not models of clarity or consistency," the Court agreed that they "dominantly and consistently applied the fraud statute to bribery and kickback schemes." Id. After discussing precedents permitting a "limiting construction" of Federal statutes, the Court concluded:

> Although some applications of the pre-McNally honest-services doctrine occasioned disagreement among the Courts of Appeals, these cases do not cloud the doctrine's solid core: The "vast majority" of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes. Indeed, the McNally case itself, which spurred Congress to enact § 1346, presented a paradigmatic kickback fact pattern. Congress' reversal of McNally and reinstatement of the honest-services doctrine, we conclude, can and should be salvaged by confining its scope to the core pre-McNally applications.

Id., *27 (citations omitted). Accordingly, "§ 1346 criminalizes *only* the bribe-and-kickback core of the pre-McNally case law." Id., *28 (emphasis in original).

The Court then explicitly rejected the Government's argument that Section 1346 should encompass a third category of conduct, namely "undisclosed self-dealing by a public official or private employee- i.e., the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." Id., *28. The Court found that, rather than involving nondisclosure of material

9

information, the McNally case itself "involved a classic kickback scheme," and that "[r]eading § 1346 to proscribe bribes and kickbacks - and nothing more - satisfies Congress' undoubted aim to reverse McNally on its facts." Id. The Court was also not "persuaded that the pre- McNally conflict-of-interest cases constitute core applications of the honest-services doctrine" in light of the broad degree of variation on this subject. Id., *29. Finally, the Court applied the "familiar principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity" to prohibit application of Section 1346 beyond the bribe-and-kickback core "absent Congress' clear instruction otherwise." Id.

The Skilling decision thus makes two things clear. First, honest services mail and wire fraud "covers only bribery and kickback schemes," and conduct that "entail[s] no bribe or kickback… does not fall within § 1346's proscription." Id., *8. Second, nondisclosure of a conflict of interest – the only theory upon which petitioner Geddings was prosecuted – is specifically *excluded* from the reach of Federal fraud. See id., *28-29.

## PETITIONER IS ENTITLED TO 28 U.S.C. § 2241 RELIEF

At this stage in the instant proceedings, petitioner has already exhausted his direct appeal and has litigated a Section 2255 motion. He concededly cannot meet the "gatekeeping" provisions of 28 U.S.C. § 2255(h), because he is not in possession of newly discovered evidence and because the Skilling decision did not create "a new rule of constitutional law." However, petitioner submits that this Court can and should grant relief to him pursuant to 28 U.S.C. § 2241.

28 U.S.C. § 2255(e) contains a "savings clause" in which, if the Section 2255 remedy is "inadequate or ineffective to test the legality of detention, a federal prisoner may seek a writ of habeas corpus pursuant to § 2241." In re Jones, 226 F.3d 328, 333 (4th Cir. 2000). The

10

petitioner in Jones was convicted in 1993 of using or carrying firearms during a drug trafficking offense pursuant to 18 U.S.C. § 924(c)(1). Two years after his conviction, the Supreme Court decided Bailey v. United States, 516 U.S. 137 (1995), which held that mere possession of a firearm during a drug crime was not sufficient to satisfy the "using or carrying" element of the offense. In the wake of Bailey, Jones, who was convicted because firearms were found in a locked closet of his apartment while cocaine was stored in another room, sought to test the legality of his conviction under Section 2255.

By this time, Jones – like the petitioner herein – had already litigated both a direct appeal and a Section 2255 motion. The Fourth Circuit held that Jones did not satisfy the gatekeeping requirements of 28 U.S.C. § 2255(h) because Bailey did not create a new constitutional rule. See Jones, 226 F.3d at 331-32. The court, however, held that Jones was entitled to challenge his conviction under Section 2241. Id. at 333-34.

The Jones court stated that "[i]t is beyond question that § 2255 is not inadequate or ineffective merely because an individual is unable to obtain relief under that provision." Id. at 333. "Nevertheless, there must exist some circumstance in which resort to § 2241 would be permissible; otherwise, the savings clause itself would be meaningless." Id. After surveying other post-Bailey decisions in sister circuits,[5] the Fourth Circuit outlined a three-part test for determining whether resort to Section 2241 was permissible:

> [W]e conclude that § 2255 is inadequate and ineffective to test the legality of a conviction when: (1) at the time of conviction, settled law of this circuit or the Supreme Court established the legality of the conviction; (2) subsequent to the prisoner's direct appeal and first § 2255 motion, the substantive law changed such that the conduct of which the prisoner was convicted is deemed not to be criminal; and (3) the prisoner cannot satisfy the gatekeeping

---
[5] See In re Davenport, 147 F.3d 605, 608 (7th Cir. 1998); In re Dorsainvil, 119 F.3d 245, 251-52 (3d Cir. 1997); Triestman v. United States, 124 F.3d 361, 373 (2d Cir. 1997).

>provisions of § 2255 because the new rule is not one of constitutional law.

Id. at 333-34; accord Davis v. United States, 417 U.S. 333, 346 (1974) (collateral relief is available where an intervening Supreme Court decision makes clear that the petitioner was convicted and punished "for an act that the law does not make criminal"); Gilbert v. United States, 2010 WL 2473560, *5 (11th Cir. Jun. 21, 2010) (Section 2241 relief available where a "circuit law busting, retroactively applicable Supreme Court decision" removes conduct from the ambit of a penal statute).

Petitioner Geddings meets all three of the criteria in Jones. First, at the time of his conviction and direct appeal, Fourth Circuit precedent such as United States v. Bryan, 58 F.3d 933 (4th Cir. 1995), supported the conflict-of-interest theory under which he was prosecuted.[6] Second, as discussed above, the Skilling decision has expressly rejected the theory that an undisclosed conflict of interest – even when combined with official action that favors such interest – constitutes honest services fraud. As such, the "substantive law [has] changed" and the conduct for which petitioner was convicted is now "deemed not to be criminal." Third, the Skilling case did not purport to create a new rule of constitutional law, but instead sought to divine and clarify the intent of Congress in enacting 18 U.S.C. § 1346. Therefore, this Court can and should grant relief to petitioner under Section 2241.

Finally, petitioner satisfies all jurisdictional and standing criteria required to seek Section 2241 relief. As the Jones court noted, a Section 2241 motion must be brought in "the district wherein the restraint complained of is had." See Jones, 226 F.3d at 332, citing 28 U.S.C. § 2241(a). Prior to petitioner's release, that was the Southern District of Georgia. However, when

---

[6] The Fourth Circuit relied in part on Bryan in affirming the petitioner's conviction. See Geddings, 278 Fed. Appx. at 281 n.6.

12

this Court released petitioner in its order of June 29, 2010, it directed him to report to the United States Probation Office for the Eastern District of North Carolina, and he has done so. Thus, the locus of petitioner's "restraint" has been transferred to this District, and the instant motion may properly be filed in this Court.

Additionally, petitioner continues to be "in custody under or by color of the authority of the United States," see 28 U.S.C. § 2241(c)(1), even though he has been released from prison. It is well settled that, for purposes of habeas relief, the term "custody" encompasses "not only individuals subject to immediate physical imprisonment, but also those subject to restraints not shared by the public generally that significantly confine and restrain freedom." Lehman v. Lycoming County Children's Services Agency, 458 U.S. 502, 510 (1982). Bail and release on one's own recognizance while criminal charges remain pending qualify as custody, see Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 300-02 (1984); Lefkowitz v. Newsome, 420 U.S. 283, 286 n.2, 292 n.8 (1975), as does supervision by probation officers, see Hammitt v. United States Probation Office, 235 Fed. Appx. 129, 130 n.2 (4th Cir. 2007); Jackson v. Coalter, 337 F.3d 74, 78-79 (1st Cir. 2003). Here, even though petitioner is no longer incarcerated, he remains under the supervision of the United States Probation Office and the criminal action against him remains pending, so he remains in custody. See Lydon, 466 U.S. at 300-02 (defendant whose conviction was vacated and who was released on recognizance bond pending new trial was still in custody for habeas purposes). Accordingly, with all jurisdictional and substantive prerequisites to Section 2241 relief satisfied,[7] this Court should grant the instant petition and bring the criminal action against petitioner Geddings to an end.

---

[7] Because this Declaration and Memorandum is made under penalty of perjury by counsel for the petitioner, it is "signed and verified by… someone acting on [the petitioner's] behalf." See 28 U.S.C. § 2242.

## **CONCLUSION**

WHEREFORE, this Court should grant the instant petition in its entirety, vacate the judgment of conviction entered against petitioner in the matter of <u>United States v. Geddings</u>, Docket No. 5:06-CR-00136-D3 (E.D.N.C.), dismiss all charges under that indictment, remit the fine and special assessment paid by petitioner, and grant such other and further relief as this Court may deem just and proper.

Dated: New York, NY
July 1, 2010

    s/Jonathan I. Edelstein
JONATHAN I. EDELSTEIN
Attorney for Defendant
271 Madison Avenue, 20 Fl.
New York, NY 10016
jonathan9@earthlink.net
(212) 871-0571 x208
Fax: (212) 382-3610
NY Bar No. 2904605

    s/Eugene H. Matthews
EUGENE H. MATTHEWS
Attorney for Defendant
Richardson Plowden & Robinson, P.A.
1900 Barnwell Street
Columbia, SC 29202
GMatthews@RichardsonPlowden.com
(803) 576-3733
Fax: (803) 779-0016
State Bar No. 22482
Local Civil Rule 83.1 Counsel